MOLO OIL COMPANY, Mulgrew Oil
Co., and DRBE Properties,
L.L.C., Appellants,

and

Dodds River Terminal, Inc.,

v.

THE CITY OF DUBUQUE, Iowa, and
the City Council of the City of
Dubuque, Iowa, Appellees.

No. 03–1623.

Supreme Court of Iowa.

Feb. 18, 2005.

Michael J. Coyle, Douglas M. Henry, and Norman J. Wangberg of Fuerste, Carew, Coyle, Juergens & Sudmeier, P.C., for appellants.

Barry A. Lindahl, Corporation Counsel, and James A. O'Brien, Jr., Assistant City Attorney, for appellees.

WIGGINS, Justice.

The plaintiffs in this appeal are Molo Oil Company, Mulgrew Oil Company, and DRBE Properties, L.L.C. (collectively referred to as "landowners").[1] The landowners filed a petition seeking certiorari, declaratory, and injunctive relief after the City of Dubuque adopted an amendment to its zoning ordinance as part of the city's master plan to transform the Ice Harbor area from an industrial area into a pedestrian-oriented environment. The amendment made the landowners' businesses nonconforming uses. The district court denied the landowners' requested relief, concluding the amendment to the zoning ordinance was a proper exercise of the city's police power. The district court also concluded it was without authority to decide whether the actions of the city constituted a taking without just compensation under the Fifth and Fourteenth Amendments to the United States Constitution and article I, section 18 of the Iowa Consti-tution for the reason that the landowners failed to exhaust their administrative remedies.[2] Because we agree with the district court's decision, we affirm it.

I. Background Facts and Proceedings.

Each landowner owns or leases property south of the Ice Harbor abutting the Mississippi River in Dubuque. Before April 15, 2002, the landowners' properties were zoned heavy industrial. The landowners use their properties consistent with a heavy industrial zoning classification. The zoning ordinance described the general purpose and description of a heavy industrial district as follows:

The HI Heavy Industrial District is intended to provide appropriate locations for those industrial uses which by their nature tend to generate levels of smoke, dust, noise, or odors that render them incompatible with virtually all other land uses. The Council finds that the continued operation and development of such quasi-nuisance uses is necessary to the economic health and public welfare of the community, but that the potentially harmful impacts of such uses upon surrounding activities requires them to be physically isolated or "buffered" from adjacent uses that may be adversely affected. For this reason, the HI Heavy Industrial District will be mapped only in areas where topographic features of adjacent Light Industrial Districts mitigate the effects of the zone upon nearby uses. This District is also designed to accommodate the expansion of existing uses and provide for infill of vacant par-

---

1. Originally, there were two other plaintiffs involved in this action, Iowa Oil Co., who dismissed its claim before trial, and Dodds River Terminal, Inc., who leased its land from Dubuque and has not appealed the district court ruling.

2. As discussed in division V, the failure of a party to exhaust its administrative remedies in the context of an inverse condemnation claim is a condition precedent to ripeness.

cels but is not generally intended to be an expandable district other than through the use of a planned unit development district as provided in Section 3–5.5 of this Ordinance.

Dubuque Mun.Code app. 3–4.2 (1999).

In 1989, the city designated the north side of the Ice Harbor as an urban renewal district. Some time after 1996, the city hired an urban designer to create a master plan for the Ice Harbor area. The designer's report determined the most appropriate use for the Ice Harbor area was not heavy industrial. After receiving the report, the city began to encourage redevelopment of the area on the north side of the Ice Harbor and to create a master plan and design for the entire Ice Harbor area. Beginning in 2001, the property north of the Ice Harbor, which was also zoned heavy industrial, underwent a major redevelopment and urban renewal effort. A $188 million campus developed, consisting of a river walk, expansion of a museum/aquarium complex, construction of a hotel/indoor water park, and construction of an education and conference center.

The city adopted the Port of Dubuque Master Plan in March 2002. The plan stated, "the total project build out for both the North and South Port areas is anticipated to take approximately eighteen to twenty years." The master plan suggested changing the character of the area south of the Ice Harbor away from industrial uses to a pedestrian-oriented environment with places for employment and residential uses above office spaces. The master plan reflected the city's conclusion that industrial uses on the south side of the Ice Harbor were no longer compatible with recent recreational and commercial uses authorized by the city in the area north of the Ice Harbor, because the area south of the Ice Harbor is not physically isolated or buffered from the area north of the Ice Harbor. Other reasons supporting the conclusion the area south of the Ice Harbor was no longer suitable for industrial uses were the area had access problems due to the need to cross a set of railroad tracks, and the riverfront was not needed by the industrial uses located in the area.

To implement the master plan, on April 15, 2002, the city council passed an ordinance reclassifying the landowners' properties from heavy industrial to planned unit development (PUD).[3] The PUD ordi-

---

3. This zoning ordinance provides the general purpose and description of the PUD district is intended to encourage flexible and innovative design in the development of appropriate sites as integrated project units. Regulations for this district are designed:

  (1) To allow a workable, interrelated mix of diverse land uses;

  (2) To encourage flexibility in design for efficiency and cost savings for the developer and the community;

  (3) To maximize the potential for large-scale office, residential, commercial and industrial development and at the same time reduce to a minimum the impact of the development on surrounding land uses and the natural environment;

  (4) To encourage new development to preserve and utilize existing land characteristics and features which offer visual recreational benefits or other amenities;

  (5) To promote the economic, attractive, innovative, and harmonious arrangement and design of new buildings, streets, utilities and other improvements or structures;

  (6) To provide a living, working and shopping environment within the layout of the site that contributes to a sense of community and a coherent lifestyle;

  (7) To provide for the creation and preservation of more and larger useable public or common open spaces that would normally be provided under conventional development;

  (8) To encourage the careful design and planning of larger development projects;

  (9) To give developers reasonable assurances regarding project approvals before the unnecessary expenditure of de-

nance covered the entire Port of Dubuque area, including the areas located to the north and south of the Ice Harbor. Under the terms of the ordinance, the city allowed the landowners to continue to operate as nonconforming uses with conditions. For example, a nonconforming use cannot expand in gross floor area nor change in use from one nonconforming use to another nonconforming use without a variance. If more than fifty percent of a nonconforming use is destroyed, the landowner cannot rebuild without a variance. This fifty-percent rule is more restrictive than the seventy-five percent rule contained in the city's general zoning ordinance. Finally, there are also restrictions regarding signage, outdoor storage, and screening.

The landowners brought this action against the city and the city council on May 10, 2002, seeking certiorari, declaratory, and injunctive relief. The landowners claimed the ordinance was arbitrary, capricious, or an unreasonable exercise of the city's police power, and the adoption of the PUD resulted in a taking of their properties without just compensation under the Fifth and Fourteenth Amendments to the United States Constitution and article I, section 18 of the Iowa Constitution.

After a bench trial, the district court entered its findings of fact and conclusions of law and decree denying the landowners any relief. The district court concluded the ordinance was a proper exercise of the city's police powers. In regards to the landowners' taking argument, the district court determined it could not address this issue because the landowners did not exhaust their administrative remedies. The landowners appeal.

## II. Issues.

On appeal, the landowners argue the ordinance adopting the PUD is an invalid exercise of the city's police power. They also argue the enactment of the PUD ordinance constitutes a taking of the landowners' properties without just compensation. In response to the landowners' claim that the ordinance is a taking, the city argues we cannot decide this issue until the landowners exhaust their administrative remedies.

## III. Scope of Review.

■ On appeal, we consider and review a case in the same manner as the district court tried the case. *Bricker v. Maytag Co.*, 450 N.W.2d 839, 840–41 (Iowa 1990). Although the landowners filed the case in equity, the parties and the district court tried this case as a certiorari proceeding. A certiorari proceeding is "governed by the rules applicable to appeals in ordinary actions." Iowa R. Civ. P. 1.1412. Thus, our review is limited to correction of errors at law, and we are bound by the findings of the trial court if they are supported by substantial evidence in the record. Iowa R.App. P. 6.14(6)(*a*); *accord Osage Conservation Club v. Bd. of Supervisors*, 611 N.W.2d 294, 296 (Iowa 2000).

## IV. Is the Enactment of the PUD Ordinance by Dubuque an Invalid Exercise of the City's Police Power?

■ It is well-settled law that zoning decisions are "an exercise of the police powers delegated by the State to municipalities." *Neuzil v. City of Iowa City*, 451 N.W.2d 159, 163 (Iowa 1990). Iowa Code section 414.3 provides zoning regulations

sign efforts, while providing the city with appropriate assurances that approved PUDs will retain the character

envisioned at the time of project approval.
Dubuque Mun.Code app. § 3–5.5.

"shall be made in accordance with a comprehensive plan and designed ... to encourage efficient urban development patterns ... [and] to promote health and the general welfare." Iowa Code § 414.3 (2001). Section 414.3 also provides zoning regulations

> shall be made with reasonable consideration, among other things, as to the character of the area of the district and the peculiar suitability of such area for particular uses, and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout such city.

*Id.*

■ " '[A zoning] ordinance is valid if it has any real, substantial relation to the public health, comfort, safety, and welfare, including the maintenance of property values.' " *Shriver v. City of Okoboji,* 567 N.W.2d 397, 401 (Iowa 1997). Zoning ordinances carry with them a strong presumption of validity. *Perkins v. Bd. of Supervisors,* 636 N.W.2d 58, 67 (Iowa 2001). The party asserting the invalidity of the zoning regulation has the burden of proving the zoning regulation is unreasonable, arbitrary, capricious, or discriminatory. *Id.* If the reasonableness of a zoning ordinance is fairly debatable, we will not substitute our judgment for that of the legislative body. *Id.; see also Euclid v. Ambler Realty Co.,* 272 U.S. 365, 388, 47 S.Ct. 114, 118, 71 L.Ed. 303, 311 (1926); *Shriver,* 567 N.W.2d at 401. The reasonableness of a zoning ordinance is fairly debatable when for any reason it is open to dispute or controversy on grounds that make sense or point to a logical deduction, and where reasonable minds may differ; or where the evidence provides a basis for a fair difference of opinion as to its application to a particular property. *Neuzil,* 451 N.W.2d at 163–64.

■ The landowners argue we must balance the possible public good against the harm to the landowners to determine whether the zoning was unreasonable as applied to the landowners. We appeared to use this test in *F.H. Uelner Precision Tools & Dies, Inc. v. City of Dubuque,* 190 N.W.2d 465, 468–69 (Iowa 1971), to overturn a zoning ordinance downzoning an industrial district to a residential district. We do not believe the validity of a zoning statute depends on the balancing test used in *F.H. Uelner Precision Tools & Dies, Inc.*

■ A property owner does not have a vested right in the continuation of a particular zoning classification. *Quality Refrigerated Servs. Inc. v. City of Spencer,* 586 N.W.2d 202, 206 (Iowa 1998). In reviewing an ordinance, we are predominantly concerned about the general purpose of the ordinance, not any hardship that may result in an individual case. *Shriver,* 567 N.W.2d at 401. To the extent the balancing test used in *F.H. Uelner Precision Tools & Dies, Inc.* is inconsistent with the fairly debatable standard applied in *Neuzil, Shriver, and Perkins,* it is overruled.

Applying the fairly debatable standard to this case, the district court found that the city retained experts in urban planning and design to formulate the Port of Dubuque Master Plan. After reviewing the reports of the experts and receiving input from its citizens at public hearings, the city concluded the rezoning (1) encouraged efficient urban development patterns; (2) promoted the health and general welfare by prohibiting new or expanded development that would be incompatible with the commercial, recreational, and residential uses in the area north of the Ice Harbor; and (3) was made with a view to encourage the most appropriate use of the land.

These conclusions are supported by substantial evidence showing industrial uses

by their nature tend to generate levels of smoke, dust, noise, or odors rendering them incompatible with most other uses, and there is no way to adequately screen the area north of the Ice Harbor from the area south of the Ice Harbor. Substantial evidence also supports the finding by the district court that the area south of the Ice Harbor had access problems due to the railroad tracks, and the businesses located in the area were not using the riverfront in connection with their business operations. Finally, substantial evidence supports that the economic impact to the area south of the Ice Harbor would add a substantial number of new jobs to the area and increase property values in the area by at least $40 million, resulting in a million dollars per year in added tax revenue to the city.

Although the landowners contend the city rezoned the area to force them to relocate, substantial evidence supports the district court's conclusion that the reasonableness of the zoning ordinance is fairly debatable. Therefore, we agree with the district court's determination that the city's enactment of the PUD ordinance was a proper exercise of its police power.

## V. Does the Enactment of the PUD Ordinance by Dubuque Constitute a Taking of the Landowners' Property Without Just Compensation?

In its petition, the landowners allege, "the adoption of the ordinance constitutes an improper condemnation or taking of the [landowners'] property. . . ." In essence, the landowners' claim is for inverse condemnation. An inverse condemnation occurs when a government body takes an owner's property without the institution of formal condemnation proceedings under our statutes. *Scott v. City of*

*Sioux City*, 432 N.W.2d 144, 145 n. 1 (Iowa 1988).

A person may not be "deprived of property, without due process of law; nor shall private property be taken for public use without just compensation" under the Fifth Amendment to the federal Constitution. U.S. Const. amend. V. The Fifth Amendment prohibition of taking private property for public use without just compensation applies to the states through the Fourteenth Amendment. *Chi., Burlington & Quincy R.R. v. City of Chicago*, 166 U.S. 226, 239, 17 S.Ct. 581, 585–86, 41 L.Ed. 979, 985 (1897). The Iowa Constitution has a similar provision providing that "[p]rivate property shall not be taken for public use without just compensation first being made. . . ." Iowa Const. art. I, 18.

A "taking" under the federal and Iowa constitutions is not limited to the appropriation of a fee. A taking occurs when there is even a minimal, permanent physical occupation of real property. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 434–35, 102 S.Ct. 3164, 3175, 73 L.Ed.2d 868, 882 (1982). A government action that does not intrude upon or occupy the property, but affects and limits the use of the property, can also be a taking. *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322, 326 (1922). "[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Id.*

Before we can address the landowners' claim of inverse condemnation, we must determine if the matter is ripe for adjudication. *Iowa Coal Mining Co. v. Monroe County*, 555 N.W.2d 418, 432–34 (Iowa 1996). If the inverse condemnation claim is not ripe for adjudication, the court does not have the authority to hear the case and must dismiss it.[4] *Id.*

4. In *In re Estate of Falck*, we discussed the difference between subject matter jurisdiction

at 432. Exhaustion of one's administrative remedies is a condition precedent to ripeness. *Id.* at 433. As we have previously stated:

> In a state inverse condemnation proceeding like the present one, it is inaccurate to talk in terms of exhaustion of state remedies because the proceeding itself is a state remedy. Our only concern in such a proceeding is whether there has been finality, the other condition precedent to ripeness. Finality equates to exhaustion of administrative remedies under the challenged regulatory ordinance so that a final, reviewable decision must be made regarding the use of the property. A court can make no determination of the takings claim until the regulatory authority under the ordinance makes that final decision.

*Id.* at 434. With these principles in mind, we must determine if the landowners' inverse condemnation claim is ripe for adjudication by examining whether the landowners exhausted their administrative remedies.

The PUD ordinance declared the existing industrial uses in the area south of the Ice Harbor are not compatible with the retail, institutional, and entertainment uses envisioned for the Port of Dubuque. It therefore made all the industrial uses in the area south of the Ice Harbor nonconforming uses. Although the PUD ordinance restricts the expansion of these nonconforming uses, the ordinance allows existing businesses to operate as long as there is no change in use or an expansion of an existing use.

The general zoning ordinance of Dubuque contains provisions that may grant the landowners relief from the no-change or expansion provisions of the PUD ordinance. One such provision allows the zoning administrator to interpret the provisions of the PUD ordinance. Dubuque Mun.Code app. § 5–4 (1989). If a business wants to make a change in its operation, it can request an opinion from the zoning administrator as to whether the proposed change would comply with the PUD ordinance. If the business is not satisfied with the zoning administrator's decision, the business owner has a right to appeal the decision to the board of adjustment. *Id.* § 5–5. If the business does not obtain relief from the board of adjustment, the board's actions are subject to judicial review by filing a petition for certiorari. *See* Iowa Code § 414.15.

Another provision of the general zoning ordinance allows a person to seek a variance to the PUD ordinance from the board of adjustment. *See* Iowa Code § 414.7; Dubuque Mun.Code app. § 5–2. Again, if the person is not satisfied with the board of adjustment's decision on his or her request for a variance, he or she may seek judicial review of the board's decision by filing a petition for certiorari. *See* Iowa Code § 414.15. Only after a property owner exhausts his or her appeals would a court be in a position to determine the inverse condemnation claim because at that point the allowable use of the property would be finally determined.

In the present case, Dubuque passed the PUD ordinance on April 15, 2002. Instead

and the lack of authority to hear a case as follows:

"Subject matter jurisdiction" refers to the power of a court to deal with a class of cases to which a particular case belongs. A constitution or a legislative enactment con-

fers subject matter jurisdiction on the courts. Although a court may have subject matter jurisdiction, it may lack the authority to hear a particular case for one reason or another.

672 N.W.2d 785, 789–90 (Iowa 2003).

of seeking relief from the PUD ordinance through the zoning administrator or the board of adjustment, the landowners filed their petition on May 10, 2002. Under these circumstances, the landowners' inverse condemnation claim is not ripe for adjudication, because the city has never had the opportunity to make a final and reviewable decision regarding the uses of the landowners' properties that the city would actually allow with the PUD ordinance in effect. Accordingly, we affirm the district court's determination that the landowners did not exhaust their administrative remedies. For this reason, the landowners' claim of inverse condemnation is not ripe for adjudication, and we must dismiss this claim on the ground the district court did not have authority to hear the case. *See Iowa Coal Mining Co.*, 555 N.W.2d at 436.

## VI. Disposition.

We affirm the district court's judgment because the enactment of the PUD ordinance by the City of Dubuque was a valid exercise of its police power, and the district court did not have authority to hear the landowners' inverse condemnation claim.

**AFFIRMED.**