# IN THE SUPREME COURT OF IOWA

No. 15–1413

Filed December 9, 2016

Amended February 21, 2017

**RESIDENTIAL AND AGRICULTURAL ADVISORY COMMITTEE, LLC,** an Iowa Limited Liability Company; **MATT MESCHER; ALLAN R. DEMMER; CATHERINE DEMMER; WAYNE AMESKAMP; SHARON AMESKAMP; VERNON BOGE; DONALD BOGE; MARY ANN RUBLY; JOHN R. RUBLY; DOLORES THIER; LARRY THIER; GARY BURKLE; CINDY BURKLE; WAYNE VORWALD; LINDA VORWALD; JEFF PAPE; GERALD WOLF;** and **JOANNE WOLF,**

Appellants,

vs.

**DYERSVILLE CITY COUNCIL, MAYOR JAMES A. HEAVENS, MIKE ENGLISH, MARK BREITBACH, ROBERT PLATZ, MOLLY EVERS,** and **DAN WILLENBORG,**

Appellees.

---

Certiorari to the Iowa District Court for Dubuque County, Thomas A. Bitter, Judge.

Community members filed petitions for writ of certiorari challenging city council's decision that rezoned agricultural land to commercial land. The district court annulled the writs. **DECISION OF DISTRICT COURT AFFIRMED; WRITS ANNULLED.**

Susan M. Hess and Philip F. Jensen (until withdrawal) of Hammer, Simon & Jensen, P.C., East Dubuque, Illinois, for appellants.

Jenny L. Weiss and Douglas M. Henry of Fuerste, Carew & Sudmeier, P.C., Dubuque, and Nicholas C. Thompson of Cottingham & Butler, Inc., Dubuque, for appellees.

**ZAGER, Justice.**

The Dyersville City Council voted to rezone the area containing the *Field of Dreams* movie site from A-1 Agricultural to C-2 Commercial in order to facilitate the development of a baseball and softball complex. Community members filed two writs of certiorari, now combined, challenging the rezoning. The district court annulled both writs. The community members appealed the decision of the district court arguing that, since the city council acted in a quasi-judicial function, the actions of the city council in passing each of the ordinances was invalid for a number of reasons. They also argued there was sufficient opposition to the rezoning to trigger a unanimous vote of the city council contained in the Dyersville city code. For the following reasons, we affirm the decision of the district court and annul the writs.

## I. Background Facts and Proceedings.

The 1989 *Field of Dreams* movie was filmed primarily at the Lansing farm now located in Dyersville, in rural Dubuque County.[1] Due to the popularity of the film, Donald and Rebecca Lansing kept the baseball field and their white farmhouse intact for visitors and tourists. The house and baseball diamond were a popular destination, and thousands of tourists visited the Lansing property each year. In recent years, however, tourist numbers have been declining.

The City of Dyersville has a comprehensive plan for the city that has been in place for many years. In the early 1960s, the city enacted a plan that included Dyersville City Zoning Ordinance No. 285, which states purposes for rezoning, one of which includes:

---

[1]At the time the movie was filmed, the Lansing farm was not yet annexed into the City of Dyersville.

> WHEREAS, the City Council of City of Dyersville, Iowa deems it necessary in order to lessen congestion in the streets; to secure safety from fire, panic and other dangers; to promote health and the general welfare; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population; to facilitate the adequate provision of transportation, water, sewerage, schools, parks, and other public requirements; to conserve the value of buildings and property; and to encourage the most appropriate use of land throughout the City with reasonable consideration, and in accordance with a comprehensive plan.

Dyersville, Iowa, Zoning Ordinance No. 285 (1962).

The comprehensive plan also states that any zoning regulations enacted by the council "shall be made with reasonable consideration" as to concerns such as the character of the area, the suitability of the area for certain uses, the conservation of buildings and values, and the encouragement of the most appropriate use of the land throughout the city. Dyersville, Iowa Planning & Zoning Comm'n, Comprehensive Plan for Dyersville, Iowa 91 (1962) [hereinafter Comprehensive Plan] (quoting Iowa Code § 414.3 (1962)).

In 1974, Dyersville enacted a comprehensive development plan that included goals for future land use. The development plan included key policy goals and recommendations specific to commercial and business development. One of the goals was to "discourage proliferation of scattered commercial development throughout the residential community." Dubuque Cty. Metro. Area Planning Comm'n, Dyersville Area Comprehensive Development Plan 51 (1974). Another recommendation was to encourage the expansion of the already-existing central business district through a coordinated design scheme. *Id.* at 52. The plan also noted that the city should encourage businesses to be located only in those areas that were easily accessible for water and sewage services. In 1975, the city supplemented the plan with a

requirement for a detailed evaluation of water, sewage, and waste systems. *See* Dyersville, Iowa, Planning & Zoning Comm'n, Dyersville Area Comprehensive Development Plan Supplemental Section, Intro (1975).

In 1991, the city drafted a community builder plan. This plan expressly addressed the impact of the *Field of Dreams* movie on the city's tourism and concluded that the main concern was that "Dyersville must become much more aggressive in guiding and encouraging its own growth." Dyersville, Iowa, Community Builder Plan: A Five Year Strategic Plan, Intro 2 (1991) [hereinafter Community Builder Plan]. The 1991 plan listed twelve opportunities for growth in the city, one of which was "continued (national/international) attention for Field of Dreams and other tourist attractions." *Id.* at 5. It also identified eleven threats to the city's growth, one of which was "loss of Field of Dreams or other major tourist attraction." *Id.* The plan concluded that, without any changes, Dyersville's three main tourist attractions would continue to attract a consistent number of tourists. *Id.* at 6. In 1997, the city supplemented the community builder plan to evaluate which goals had been met and how to pursue the remaining goals. Dyersville, Iowa, Community Builder Plan (1997).

In 2003, the City of Dyersville drafted a future annexation plan that identified areas of nearby land that were likely to be annexed into the city in the future. The annexation plan grouped areas of land into those likely to be annexed within five years, five to ten years, or ten to twenty years. At that time, the *Field of Dreams* property was not included in any of these annexation estimates.

In 2010, the Lansings listed their property for sale. Their property included the baseball diamond and white farmhouse, and an additional

193 acres that are used as farmland. Ultimately, the Lansings signed a purchase agreement with Mike and Denise Stillman. The sale was contingent upon the property being rezoned for commercial use, among other things. The Stillmans intended to create All-Star Ballpark Heaven on the land, a baseball and softball complex with up to twenty-four fields to be used for youth baseball and softball. They intended to continue to maintain the farmhouse and original baseball diamond as a tourist attraction.

The Dyersville City Council met on November 21, 2011. One of the action items on the agenda was "Authorize City Administrator to Sign IIW Proposal for Professional Services for Field of Dreams Utilities Extension Feasibility Study 2011." The proposal provided that the City of Dyersville would pay IIW Engineering approximately $9625 to prepare a utilities extension feasibility study. This study would determine the cost and logistics of providing water and sewer services to the *Field of Dreams* site. The feasibility study was discussed for approximately nineteen minutes, with the mayor,[2] the city administrator,[3] and various city council members weighing in. Jacque Rahe, the director of the Dyersville Economic Development Corporation (DEDC) also discussed how to secure funding for the project so the city could avoid any taxpayer burden. She discussed talking to state officials to secure funding and a future meeting with the Governor. The motion to approve the study was passed unanimously by the city council. On December 5, the city council held a special meeting immediately following the regular city council meeting. The sole agenda item for the special meeting was a

---

[2]The mayor of Dyersville at the time of the meeting was James Heavens.

[3]The city administrator of Dyersville at the time of the meeting was Michael Michels.

presentation by the Stillmans, entitled "Future Development of Field of Dreams."

In December, the Stillmans organized a bus trip to Des Moines for the purpose of meeting with legislators and other state officials to discuss financing the All-Star Ballpark Heaven project. The mayor and two city council members joined the Stillmans on the bus trip to Des Moines, and they also attended a group dinner. A member of the planning and zoning commission also participated in the bus trip to Des Moines. The Stillmans presumably funded both the bus trip and the dinner. The purpose of the trip and the dinner was to begin lobbying state officials for financial assistance in developing the project.

In early 2012, the Strategic Economics Group from Des Moines completed an economic and fiscal impact study report regarding the proposed project. The report analyzed the proposed project, the general Dubuque County area, and the potential economic impact of the project. The report predicted the project would result in the creation of 1400 new jobs by its eighth year of operation. The report also estimated $34.1 million in additional payroll and $102 million in additional goods and services for the State of Iowa, in addition to increases in local tax revenue.

The city council met again on February 20, 2012, and one of the agenda items was the "Field of Dreams Extension." A number of the petitioners and other community members attended the meeting and were able to speak about the proposed All-Star Ballpark Heaven complex. Petitioner Wayne Vorwald expressed concerns about having open-range cattle in the area if the project were completed because of the juxtaposition of urban and farming areas. Petitioners Jeff Pape and Wayne Ameskamp mentioned concerns with runoff into the nearby creek

and flooding. Ron Oberbroeckling was worried about the project interfering with deer hunting in the area. A number of community members talked about growing up on family farms and wanting to maintain those farms and values for their own families. Petitioner Matt Mescher discussed traffic concerns because one of the most dangerous intersections in the state is located in Dyersville. He also stated that his "neighbors do not want ball fields in the middle of their cornfields." Petitioners Mescher and Vorwald both proposed moving the project to the Dyersville business park.

Denise Stillman and several community members spoke in favor of the proposed project. Jacque Rahe stated that the DEDC supported the project because its mission is to make Dyersville "a better place to live, work and play." She also expressed concern about being left out of neighborhood meetings about the project and urged the community to include the DEDC.

At the April 2 city council meeting, an engineer from IIW Engineering introduced his conceptual water and sewer evaluation report and discussed the details of how to provide water and sewer services to the *Field of Dreams* area. The report estimated it would cost approximately $1.1 million to run water to the complex and approximately $2.9 million to provide sewer service. Council members and at least one community member asked questions about the report. One nearby resident expressed concerns she and her neighbors had about the impact on their wells.

At the May 7 city council meeting, council member Molly Evers expressed concerns about how the project would affect the community and requested more information about the timeline. She also mentioned she had received a number of phone calls and other correspondence from

community members about the project. She urged them to speak up and asked when the council would hold a public hearing in order to permit members from the community to speak. Two other council members agreed that they wanted to know what the citizens of Dyersville were thinking, and stated that they had also heard from a number of community members about the proposed project.

On May 21, the council met again and one of the agenda items was to receive a file and presentation by Joe Scherrman in support of the All-Star Ballpark Heaven project. Scherrman operates a business near Dyersville. He opined that the best way to preserve the original movie site was to expand and build extra fields around it. Council member Evers again expressed concern about input from the community and asked when a public hearing would be set. At least one of the petitioners was present at the meeting. Petitioner Ameskamp expressed concerns about flooding, water runoff, and traffic. He also asked what would happen to the land if the project failed and there were not enough kids in and around Dyersville to support twenty-four new baseball and softball fields. He was also concerned about the impact the project would have on his ability to hunt on his own land.

At the June 4 city council meeting, one of the council members moved to table Resolution 31-12. The resolution was an application by the Lansings and several other Dubuque County property owners who were seeking to voluntarily annex their property into the City of Dyersville.[4] The annexation of the Lansing property into the city was one of the conditions of the Stillmans' purchase agreement for the Lansing

---

[4]The property owners who were seeking to annex their property into Dyersville were Donald L. Lansing, Rebecca L. Lansing, Gerald Deutmeyer, Alice M. Deutmeyer, John E. Rahe, Nicole Rahe, Keith G. Rahe, Jacque K. Rahe, and Dorothy Meyer.

farm. Because the application still needed the signature of one of the property owners, the resolution was tabled.

On June 11, a special meeting of the Dyersville City Council was held with the mayor and all council members present. A number of community members spoke about the proposed project, both in favor of and against. A number of community members continued to express concerns about traffic, water runoff, hunting, and rural family values. Several members of the public who spoke were undecided, but were upset with some of the false information that was being spread by community members who were opposed to the project. A handful of the community members present expressed a desire for a referendum or vote on the issue of the proposed project and any necessary zoning change. The council members also discussed Resolution 31-12 and unanimously voted to set the date to consider the annexation request for July 2.

On June 18, the city council met in a regular session to discuss Resolution 35-12, which was a resolution requesting approval of a Memorandum of Understanding (MOU) between the City of Dyersville and Go the Distance Baseball, LLC.[5] The MOU was signed by the mayor and the developers. It set forth components that were key to the anticipated development agreement to create the All-Star Ballpark Heaven. The key points were

**I) Annexation**

The City will put forth its best effort to annex all of the property the Company has under contract (the "Property") in Dubuque County into the city limits by October 1, 2012. The Company will provide reasonable assistance that shall not require out-of-pocket costs to meet this goal.

---

[5]Go the Distance Baseball, LLC is a limited liability company in Iowa. Denise Stillman is a part owner of Go the Distance, and Go the Distance is the company that would complete and manage the proposed All-Star Ballpark Heaven.

**II) TIF and Zoning**

The City will put forth its best effort to undertake the process of adding the Property to the Urban Renewal Area, establishing the Property as a tax increment financing district. Furthermore, the City agrees to use its best efforts to rezone the Property to commercial use or other appropriate use to allow the Company to use it for its intended purpose.

**III) Infrastructure Project**

The Company agrees to construct the Infrastructure Project to connect the Property to the city's water and sewer services for an estimated cost of $2.48M and in accordance with the specifications of the City. The Infrastructure Project shall be completed by no later than December 30, 2014.

**IV) Fund Obligation and Payments**

The City will undertake the authorization of a development agreement under which the City would agree to make economic development payments (the "Payments") to the Company for a period not to exceed 15 years. The amount of Payments to be made under the agreement will be subject to future negotiation amongst the parties. The City anticipates funding Payments in an amount equal to the actual costs of the Infrastructure Project without annual appropriation contingencies. Furthermore the City anticipates considering the provision of additional Payments provided that such payments are made subject to annual appropriation by the City Council. In any event all Payments will be funded exclusively from incremental property tax (TIF) revenues received by the City which are attributable to the Property.

During this meeting, the city attorney for Dyersville was asked to explain the MOU. He explained that it merely contained the intention of the parties so both parties would know that they were "headed in the same direction and that there's no road blocks that somebody may throw up." He further explained that the vote on the resolution would simply allow the council to take a vote on annexation, rezoning, and approval of the development agreement. If any of those items failed a vote, then the project would be done.

A number of residents spoke at the June 18 meeting, both in support of and in opposition to the project. Denise Stillman also spoke at the meeting and discussed the possibility of creating a dome over the fields for year-round play and a dormitory building for coaches and players to stay during tournaments. The council unanimously voted to approve the resolution.

On July 2, the council met to discuss the resolution regarding the voluntary annexation of property into the City of Dyersville. The mayor and all five city council members were present, in addition to the city attorney. A number of community members were present. A few community members, some of whom are petitioners in this case, appeared at the meeting with their attorney, Susan Hess. A television crew from KCRG Channel 9 news was present at the meeting.

Stillman spoke first in support of the project. She then introduced Ron Kittle, a former professional baseball player. He spoke about the impact of baseball in his life and the benefits the project could bring to Dyersville. The council then opened the meeting up to community members who spoke against the proposed project. Petitioner Mescher spoke about funding concerns and the impact on taxpayers. He also spoke about growing division in the small community and how the council should be taking noise and pollution into account in addition to economic benefits. Jack Mescher, son of petitioner Mescher, also spoke against the annexation. He said the city had not done the requisite hydraulic, traffic, or pollution studies. Attorney Hess stated that the citizens of Dyersville wanted to vote on the issue.[6]

---

[6]The city attorney responded that the application for voluntary annexation was considered by the council, not a public vote, under Iowa Code section 368.7.

Director of the DEDC, Jacque Rahe, spoke in support of the voluntary annexation. She pointed to the reports that estimated the project would provide twenty-four full time, year-round jobs for the citizens of Dyersville. Eric Schmechel from the Dubuque Soil and Water Conservation District spoke to address concerns about watershed management. The council members asked him questions about storm water and watershed management practices. He opined that, if done correctly, the project could actually improve the location's water runoff problems. When the motion came to a vote, the council voted 4–1 to approve the resolution. Evers was the sole council member voting no.

The council also voted on Resolution 38-12, which was a resolution to refer the rezoning of the property from A-1 Agriculture to C-2 Commercial to the planning and zoning commission. The city administrator explained that the proposal for rezoning was for conditional use

> for the preservation of the existing white farmhouse with wrap-around porch overlooking the Field of Dreams, the preservation of the existing Field of Dreams, and the creation and construction of All-Star Ballpark having a complex featuring 24 baseball and softball fields targeted for competition and training for youth 8 to 14 and incidental uses thereof.

The city council unanimously voted to send the resolution to the zoning commission. On July 3, the zoning commission sent a notice to interested property owners about the public hearing it would hold regarding the proposed rezoning.

On July 8, the zoning commission hosted a work session at the Dyersville Social Center. The agenda listed the work session as a "community overview meeting" regarding the project, which would include a presentation followed by an opportunity for the community

members to ask questions. The overview was provided by Denise Stillman.

The zoning commission met the following day to discuss rezoning the *Field of Dreams* property from agricultural to commercial. The city administrator began by providing an overview to the zoning commission about the proposed rezoning. He described the area to be rezoned, which included a 200-foot buffer zone on three sides of the area that would remain agricultural. He explained that the buffer zone was "created to protect adjoining property owners" and would prevent concerns about children playing baseball right up against the adjoining property lines. He also described how the buffer zone would allow the adjacent farms to continue to spread manure and engage in other farming activities without interrupting the baseball and softball facilities. He informed the zoning commission that the city council had looked into the impact on property values, storm water and drainage issues, and crime.

A number of the petitioners also attended the meeting and were able to offer their opinions to the zoning commission. Petitioner Mescher expressed concerns that the proposed 200-foot buffer zone was designed to prevent the neighboring property owners from objecting, since the new commercial zoning area would not directly touch their land. His son also spoke about the buffer zone and concerns about the impact on water issues in the area. Several other community members had the opportunity to offer their opinions of the project, both in favor of and in opposition to the project.

Two members of IIW Engineering spoke about the study and report their group had completed. One engineer offered information about the wastewater study and how the generated wastewater would be used. Another spoke about the traffic concerns that had been raised by

community members and how the roads would be affected by increased traffic to the baseball and softball complex. After everyone was offered the opportunity to speak, the zoning commission unanimously voted to approve a positive recommendation in favor of the proposed rezoning.

On July 16, the city council met to consider Resolution 47-12, which recommended setting a date for the council to consider the proposed rezoning. The city council unanimously voted to approve the resolution and set the date for August 6. On July 25, the council published a notice in the local newspaper. On August 3, the agenda for the meeting was posted in the directory at Dyersville City Hall and on the Dyersville city website. The agenda was also sent to the *Cedar Rapids Gazette*, the *Telegraph Herald*, and the Dyersville newspapers. The agenda was additionally provided to the Dyersville Police Department and two radio news stations, KDST and KMCH.

The agenda listed the first action item as a public hearing "to approve the rezoning of certain property from A-1 Agricultural to C-2 Commercial." The second item action was Ordinance 770, which included the legal description of the land to be rezoned as

> SW 1/4 of the SE 1/4 of Section 22, Township 89 North, Range 2 West of the 5th Principal Meridian in Dubuque County, Iowa, except for the Northerly 200 feet thereof;
>
> SW 1/4 of the SW 1/4 of Section 23, Township 89 North, Range 2 West of the 5th Principal Meridian in Dubuque County, Iowa, except for the Northerly and Easterly 200 feet thereof;
>
> NE 1/4 of the NE 1/4 of Section 27, Township 89 North, Range 2 West of the 5th Principal Meridian in Dubuque County, Iowa, except for the South 200 feet of the West 200 feet and the West 200 feet of the South 200 feet thereof;
>
> NW 1/4 of the NW 1/4 of Section 26, Township 89 North, Range 2 West of the 5th Principal Meridian in Dubuque County, Iowa, except for the Southerly 200 feet of the East 400 feet and the Easterly 200 feet thereof;

Lot 1 of the SW 1/4 of the NW 1/4 of Section 26, Township 89 North, Range 2 West of the 5th Principal Meridian in Dubuque County, Iowa, except for Southerly and Easterly 200 feet thereof; and

Lot 2 of Trinity Acres of the SE 1/4 of the NE 1/4 of Section 27, Township 89 North, Range 2 West of the 5th Principal Meridian in Dubuque County, Iowa, except for the Southerly and Westerly 200 feet thereof.

At the August 6 city council meeting, attorney Hess spoke first. She urged the council to remain impartial and stated it was acting in a quasi-judicial manner and therefore was required to remain impartial. She noted concerns with the planning and zoning commission and opined that it had failed to remain impartial because the members attended a work session presentation put on by the developer. She asked the council not to vote on the rezoning at the meeting and to table the topic for a later meeting. She also referred to a letter she wrote that she had been unsuccessful in delivering to the council earlier that day. The city attorney informed the council members that he would review the letter Hess wrote on behalf of a group of concerned Dyersville citizens. He also advised the council members that a unanimous vote was not required for the proposed rezoning.

A number of the petitioners attended the meeting, in addition to other community members. There was approximately thirty minutes of discussion before the citizens at the meeting stopped volunteering to speak. Council member Evers moved to close the public hearing, which was seconded. She then moved to table the discussion of Ordinance 770, but received no second. The city council voted to approve the first reading of the ordinance, and the motion passed in a vote of 4–1, with council member Evers voting no. Evers then read a written statement and expressed community concerns about the project. She stated that more members of the community opposed the project than favored it.

The council moved to waive the second and third readings of the ordinance. The motions passed with votes of 4–1. Evers was the sole council member voting no.

On September 4, 2012, the Residential and Agricultural Advisory Committee, L.L.C. and twenty-three other individuals[7] (petitioners) filed a petition for writ of certiorari and a request for a stay and injunction against the Dyersville City Council, the mayor of Dyersville, and the individual city council members (city council). The petitioners resisted the rezoning of the *Field of Dreams* property from A-1 Agricultural to C-2 Commercial. They argued the city council acted in violation of both Iowa law and Dyersville city ordinances; in excess of its authority; arbitrarily and capriciously; and against public safety, health, morals, and the general welfare.

The district court set a one-hour hearing for September 25. After the hearing was set, Go the Distance filed a petition to intervene. Shortly thereafter, F.O.D. Real Estate, L.L.C.; Field of Dreams Movie Site, Inc.; and Donald and Rebecca Lansing also filed petitions to intervene. On September 21, the city council filed a motion to dismiss the petition. It claimed the Residential and Agricultural Advisory Committee lacked standing, and further, the city council had been acting in a legislative capacity and was immune from suit. The petitioners responded by filing a request to hold a later hearing because additional testimony and discovery was necessary "to determine the legality of the City Council's action." On September 25—the day the hearing was scheduled—the city council filed a second motion to dismiss, this time claiming the petition

---

[7]Two of the individuals later dismissed their claims.

for writ of certiorari failed to state a claim. The petitioners resisted the city council's motion to dismiss.

On October 9, the district court issued its order denying the petition for writ of certiorari. In the order, the district court concluded,

> Clearly, the Dyersville City Council had jurisdiction to hear and decide the proposed rezoning of the property in question. The Defendants have complied with any and all procedural requirements pertaining to the rezoning of the property. Proper due process rights have been afforded the Plaintiffs. The Defendants heard and considered numerous issues and concerns associated with the rezoning of the property. The Zoning and Planning Commission voted 8–0 in favor of recommending the proposed zoning change. The Court finds no illegality in the rezoning of the property. The Plaintiffs cannot demonstrate a likelihood of success on the merits.

The petitioners then filed an Iowa Rule of Civil Procedure 1.904(2) motion to enlarge, amend, or modify the order. They claimed the district court should not have determined the legality of the rezoning at the hearing because the hearing was only to determine whether a writ of certiorari should issue and not the merits of the case. The petitioners also argued the district court did not follow proper procedure for issuance of a writ of certiorari or consider all of the issues raised in the petition. The petitioners requested that the district court enter an order granting their request for additional testimony and discovery. The district court denied the 1.904(2) motion, and the plaintiffs appealed. We transferred the appeal to the court of appeals.

While this appeal was pending, the council became aware that Ordinance 770 contained an error in the legal description of the land. The ordinance described part of the land as "*SW* 1/4 of the SE 1/4 of Section 22, Township 89 North, Range 2 West of the 5th Principal Meridian in Dubuque County, Iowa, except for the Northerly 200 feet

thereof." (Emphasis added.) The correct description should have listed the property as "*SE* 1/4 of the SE 1/4 of Section 22, Township 89 North, Range 2 West of the 5th Principal Meridian in Dubuque County, Iowa, except for the Northerly 200 feet thereof." (Emphasis added.) At the May 6, 2013 city council meeting, the council voted 4–1 to approve Ordinance 777, which corrected the description of the land contained in Ordinance 770. The public was invited to speak on the issue, but no one volunteered. The city attorney classified the mistake as a typo and noted that the prior public hearing had given fair notice to the public and everyone knew which parcel of land was being discussed at the rezoning hearing.

Thereafter, a second petition for writ of certiorari was filed on May 15, 2013. This second writ of certiorari was filed in response to the city council's vote approving Ordinance 777 correcting the description of the rezoned land. The district court directed that this writ issue on May 23, and the writ was returned on June 10. Trial on the second writ was set to begin on January 6, 2014.

The court of appeals issued its decision on the first writ of certiorari on November 6, 2013.[8] The court of appeals concluded that the district court had improperly decided the merits of the petition for writ of certiorari, rather than confine its decision to whether the writ should be issued. The court of appeals reversed the decision of the district court and remanded the case to the district court for further proceedings.

On November 8, the petitioners filed a motion to consolidate the two writs of certiorari and continue the trial. The district court granted

---

[8]*Residential & Agric. Advisory Comm., L.L.C. v. Dyersville City Council*, 2013 WL5951191 (Iowa Ct. App. Nov. 6, 2013).

the motion to consolidate and set a hearing for January 6, 2014. On January 3, Go the Distance withdrew its motion to intervene.

The pending matters came before the district court for hearing on January 6. The district court heard four issues: (1) the city council's motion to dismiss the individual city council members and mayor, (2) the petitioners' 1.904(2) motion, (3) the petitioners' request for an injunction, and (4) the petitioners' motion for discovery. The district court issued its order on January 21 and denied the motion to dismiss the individual city council members, the 1.904(2) motion, and the request for an injunction. The district court denied the motion to dismiss the individual council members because legislative immunity would only apply if the council acted in a legislative capacity, which it concluded was a question of fact. The district court denied the 1.904 motion because it raised arguments that petitioners were required to appeal to the Board of Adjustment, but had failed to do. The district court denied the request for an injunction to halt development because none of the named respondents owned the property, and therefore the injunction would be meaningless.[9] The district court allowed the petitioners to continue with discovery.

On May 1, the petitioners filed a motion for issuance of writ. The court of appeals decision from November 6, 2013, required the district court to either order a writ or take other action on remand. At the time the petitioners filed the motion, the district court had yet to issue a writ or take any other action on remand. The district court issued the writ on May 29, and the writ was returned on June 12. The district court set the consolidated cases for trial.

---

[9]Neither the Lansings nor the Stillmans were ever a party to the proceedings. By the time the district court issued this order, the closing had occurred and the Stillmans owned the *Field of Dreams* site.

Trial was held between February 16 and February 24, 2015. The district court issued its order on May 21, holding that the actions of the Dyersville City Council were sustained and the writs with respect to Ordinances 770 and 777 were annulled. Petitioners filed a motion to enlarge, which the district court denied on July 24. The petitioners filed an appeal, which we retained.

**II. Analysis.**

On appeal, the petitioners raise a number of issues. They argue the district court applied the incorrect standard of review to the city council's rezoning of the land. They argue the council's actions were quasi-judicial in nature rather than legislative, triggering a different standard of review. They allege Ordinance 770 is invalid for a number of reasons. They also argue there was sufficient opposition to the ordinance from adjacent landowners to trigger Dyersville Code section 165.39(5). They assert Ordinance 777 is invalid because it purported to rezone property without following proper procedure. Last, they assert equal protection and due process violations. We address each issue in turn.

**A. Correct Standard of Review of the City Council's Actions.** We must first address the proper standard of review in this action. The petitioners argue the district court applied the wrong standard of review to the city council's actions in rezoning the *Field of Dreams* site. They argue the council's actions were quasi-judicial in nature rather than legislative. The district court order concluded that, for purposes of determining whether certiorari was available, the council was acting in a quasi-judicial manner. However, the underlying decision to rezone was a legislative function and the council was therefore not required to make

findings of fact or provide for a more formal proceeding similar to a judicial proceeding.

In chapter 335 of the Iowa Code, the legislature grants the county boards of supervisors the authority to determine zoning matters in the counties. Iowa Code §§ 335.1, .3 (2015); *see also Perkins v. Bd. of Supervisors*, 636 N.W.2d 58, 65 (Iowa 2001). This includes the power to designate areas into districts and to regulate the use of land within those districts. Iowa Code §§ 335.3, .4. "The board of supervisors shall provide for the manner in which the regulations and restrictions and the boundaries of the districts shall be determined, established, and enforced, and from time to time amended, supplemented, or changed." *Id.* § 335.6.

Chapter 414 goes on to provide specific rules, powers, and duties related to city zoning. Iowa Code section 414.4 provides that the city council "shall provide for the manner in which the regulations and restrictions and the boundaries of the districts shall be determined, established, and enforced, and from time to time amended, supplemented, or changed." *Id.* § 414.4. To do so, the city council must also follow proper procedure. *Id.* The council must give the community members published notice of the time and place of a public hearing with at least seven days' notice. *Id.*; *see also id.* § 362.3. The council must hold a public hearing during which community members are offered the opportunity to offer opinions regarding the proposed zoning or rezoning. *Id.* § 414.4. Iowa Code section 414.5 provides specific voting rules for situations where an ordinance would change land from one zoning district to another. *Id.* § 414.5. In this situation, if twenty percent or more of the owners of property located within 200 feet of the proposed rezoning area file a written protest, the council is required to approve the

rezoning ordinance by a vote of at least three-fourths of the members. *Id.*

The statutory scheme set forth in the Iowa Code mirrors the general rule that zoning determinations are a legislative function of a city council or board of supervisors. 101A C.J.S. *Zoning and Land Planning* § 2, at 18–19 (2016). Likewise, we have long recognized that "[z]oning decisions are an exercise of the police power to promote the health, safety, order and morals of society." *Montgomery v. Bremer Cty. Bd. of Supervisors*, 299 N.W.2d 687, 692 (Iowa 1980). A city council or board of supervisors exercises its delegated police power through zoning decisions so long as the decisions are "made in accordance with a comprehensive plan and designed . . . to encourage efficient urban development patterns . . . [and] to promote health and the general welfare." Iowa Code § 414.3; *id.* § 335.5; *see also Molo Oil Co. v. City of Dubuque*, 692 N.W.2d 686, 691 (Iowa 2005). A zoning decision or regulation is an exercise of delegated police powers so long as it is

> made with reasonable consideration, among other things, as to the character of the area of the district and the peculiar suitability of such area for particular uses, and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout [the] city.

Iowa Code § 414.3(2). However, we have also recognized that there are some situations in which a zoning decision can take on a quasi-judicial nature that may necessitate a different standard of review than the normally limited standard of review we utilize when reviewing zoning decisions. *See, e.g., Sutton v. Dubuque City Council*, 729 N.W.2d 796, 797 (Iowa 2006).

Some historical perspective helps in our analysis. In *Buechele v. Ray*, we laid out the test to determine whether an action is judicial or

quasi-judicial, which we noted is a difficult determination. 219 N.W.2d 679, 681 (Iowa 1974). The pertinent rule of procedure states "[a] party may commence a certiorari action when authorized by statute or when the party claims an inferior tribunal, board, or officer, exercising judicial functions, or a judicial magistrate exceeded proper jurisdiction or otherwise acted illegally." Iowa R. Civil P. 1.1401; *see also Buechele*, 219 N.W.2d at 681.[10] The term "judicial functions" as utilized in this particular rule is not construed strictly or technically and can apply if the underlying act is quasi-judicial. *Buechele*, 219 N.W.2d at 681.

Other courts have found that a body that is not a court exercises a judicial function when "(1) the questioned act involves a proceeding in which notice and opportunity to be heard are required; or (2) a determination of rights of parties is made which requires the exercise of discretion in finding facts and applying the law thereto." *Id.* While our analysis of judicial function is not as restrictive, we afford weight to the listed judicial attributes. *Id.* We also consider "whether or not the challenged act goes to the determination of some right the protection of which is the peculiar office of the courts." *Id.* However, merely exercising judgment or discretion is not sufficient to constitute a quasi-judicial act. *Id.*

In *Buechele*, we were asked to determine whether the State Executive Council's decision to employ an attorney to defend a state representative in a slander action constituted a quasi-judicial act. *Id.* at 680. The petitioners brought the action in a writ for certiorari. *Id.* The council argued on appeal that its act was not a judicial or quasi-judicial function, and therefore certiorari review was not appropriate. *Id.* at 681.

---

[10]At the time the *Buechele* case was decided, the same rule was contained in Iowa Rule of Civil Procedure 306.

We held that the council's action was a discretionary, executive decision and not the exercise of a judicial or quasi-judicial function. *Id.* at 682. In reaching this decision, we noted that none of the council's actions had any of the attributes normally associated with judicial functions: the council was not required to give notice, hold a hearing, take evidence, engage in fact finding, or make legal conclusions. *Id.*

In *Montgomery*, perhaps the most analogous case to the one before us now, the board rezoned two parcels of land from agricultural to industrial after two rezoning petitions were filed. 299 N.W.2d at 691. Following the rezoning petitions, the board gave notice, held a public hearing, and heard from both proponents and opponents of the rezoning proposal. *Id.* The board unanimously approved both rezoning requests. *Id.* Opponents of the rezoning brought petitions for writ of certiorari in the district court, which were later combined. *Id.*

On appeal, we addressed the question of the proper scope of review for a certiorari proceeding challenging a board of supervisors' rezoning decision. *Id.* at 692. We confirmed that a writ of certiorari was the proper procedure for challenging the board's amendments to the rezoning ordinance. *Id.* We found that the zoning decision by the board was an exercise of its delegated police power and held that "the generally limited scope of review applicable to this case is to determine whether the decision by the Board to rezone is fairly debatable." *Id.*

In *Sutton*, the city council passed an ordinance that amended the city's existing zoning code. 729 N.W.2d at 797. The ordinance reclassified property from a commercial recreation district to a planned unit development (PUD) district. *Id.* The ordinance passed with a vote of four to three, and two objectors brought a challenge to the rezoning decision with a petition for writ of certiorari. *Id.* The action was

dismissed as untimely, and the objectors then brought an action for declaratory judgment. *Id.* The city argued the claims were barred because certiorari was the exclusive remedy and the time limitation for bringing a certiorari challenge had already passed. *Id.* We ultimately held that the opponents of the rezoning decision were required to bring a writ of certiorari and therefore were precluded from bringing the declaratory judgment action. *Id.* at 799.

We also discussed the standards for determining whether a zoning decision has remained a legislative function or evolved into a quasi-judicial function. *Id.* at 798. We expanded on the two-part test from *Buechele* by citing to factors identified by the Washington Supreme Court in determining whether zoning activities are quasi-judicial in nature or legislative in nature:

> (1) rezoning ordinarily occurs in response to a citizen application followed by a statutorily mandated public hearing; (2) as a result of such applications, readily identifiable proponents and opponents weigh in on the process; and (3) the decision is localized in its application affecting a particular group of citizens more acutely than the public at large.

*Id.*; *see also Fleming v. Tacoma*, 502 P.2d 327, 331 (Wash. 1972) (en banc)). While we cited these factors with approval, we had the opportunity to review the entirety of the *Fleming* case and did not choose to adopt the Washington court's holding in that case that all public zoning hearings should be classified as adjudicatory.[11] *Sutton*, 729 N.W.2d at 798; *see also Fleming*, 502 P.2d at 331.

---

[11]While the Washington court held in *Fleming* that all zoning hearings should be classified as adjudicatory, the decision was later overruled in *Raynes v. City of Leavenworth*, following a legislative amendment. 821 P.2d 1204, 1209 (Wash. 1992) (en banc). In *Raynes*, the court held that the particular board decision amending a zoning ordinance was a legislative function. *Id.* at 1208.

The *Sutton* case dealt with a different situation than many of our previous zoning cases because it involved PUD zoning. *Sutton*, 729 N.W.2d at 798. We noted that the "quasi-judicial character of municipal rezoning is particularly evident in matters involving PUD zoning." *Id.* We discussed the distinction between traditional rezoning and PUD zoning:

> [Creating] zoning districts and rezoning land are legislative actions, and . . . trial courts are not permitted to sit as "super zoning boards" and overturn a board's legislative efforts.
>
> . . . .
>
> The planned unit development concept varies from the traditional concept of zoning classifications. It permits a flexible approach to the regulation of land uses. Compliance must be measured against certain stated standards. . . .
>
> . . . [S]ince the Board was called upon to review an interpretation and application of an ordinance . . . and the ordinance was not challenged per se, the Board's decision was "clearly quasi-judicial."

*Id.* (quoting *Hirt v. Polk Cty. Bd. of Cty. Comm'rs*, 578 So. 2d 415, 417 (Fla. Dist. Ct. App. 1991) (citation omitted) (emphasis added)).

We find the situation we decide today to be much more analogous to the one we faced in *Montgomery* than in *Sutton*. In this case, the city council was acting in a legislative function in furtherance of its delegated police powers. The council was not sitting to "determin[e] adjudicative facts to decide the legal rights, privileges or duties of a particular party based on that party's particular circumstances." *Montgomery*, 299 N.W.2d at 694. The city council decision to rezone was not undertaken to weigh the legal rights of one party (the All-Star Ballpark Heaven) versus another party (the petitioners). The council weighed all of the information, reports, and comments available to it in order to determine whether rezoning was in the best interest of the city as a whole. *See,*

*e.g.*, Iowa Code § 414.3(1) (describing the delegated police powers to include making decisions to promote health and the general welfare of the community). We therefore hold that the proper standard of review in this case is "the generally limited scope of review" we utilize in order "to determine whether the decision by the Board to rezone is fairly debatable." *Montgomery*, 299 N.W.2d at 692.

Zoning regulations carry a strong presumption of validity. *Molo Oil*, 692 N.W.2d at 691. A zoning regulation "is valid if it has any real, substantial relation to the public health, comfort, safety, and welfare, including the maintenance of property values." *Id.* (quoting *Shriver v. City of Okoboji*, 567 N.W.2d 397, 401 (Iowa 1997)). If the reasonableness of a zoning ordinance is "fairly debatable," then we decline to substitute our judgment for that of the city council or board of supervisors. *Id.* The reasonableness of a zoning ordinance is "fairly debatable" when

> for any reason it is open to dispute or controversy on grounds that make sense or point to a logical deduction, and where reasonable minds may differ; or where the evidence provides a basis for a fair difference of opinion as to its application to a particular property.

*Id.*; *see also Neuzil v. City of Iowa City*, 451 N.W.2d 159, 163–64 (Iowa 1990).

**B. Validity of Ordinance 770.** The petitioners allege Ordinance 770 is invalid for a number of reasons. They assert the city council was not impartial; the decision was arbitrary, capricious, and unreasonable; the rezoning was contrary to the city's comprehensive plan; and the ordinance constitutes illegal spot zoning. We discuss each of the petitioners' arguments in turn.

1. *Partiality of the city council.* The decision to rezone the *Field of Dreams* site was subject to fair debate. *See Molo Oil*, 692 N.W.2d at 691.

Members of the community came to multiple public hearings and multiple council meetings. A number of community members—not limited to the petitioners in this case—were against the rezoning. However, other community members were unsure whether they supported the rezoning and requested more information. Still others expressed support for the rezoning and the new baseball and softball complex. While it is true that several council members viewed the rezoning and the project as an opportunity for the city, each council member attended all meetings, read reports, listened to citizens speak for and against the project, asked questions, and investigated issues regarding water, sewage, crime, traffic, and other issues. Further demonstrating that the issue was subject to fair debate is the final vote on the decision to rezone. The final vote was 4–1, with one council member voting against rezoning.

There is nothing in the record that demonstrates that any council member or the mayor had any family or financial interest in the project. The petitioners claim that members of the city council and mayor could not be impartial or unbiased due to the mayor signing the MOU with the developers, and several members participating in an economic development bus trip to Des Moines to discuss the project with legislators and state officials. We disagree. The mere participation in such activities for the potential benefit of the city does not establish partiality or bias. Rather, this is more akin to the council members upholding their public duty by performing their due diligence in determining what state aid might be available to help with the project before any formal action was undertaken. The city council made its decision based on what it believed was best for the community after a full

and open discussion of the issues over many months. We agree with the district court that the city council was impartial in its rezoning decision.

2. *Arbitrary, capricious, or unreasonable.* The party attacking the validity of a zoning regulation carries the burden of demonstrating the zoning is unreasonable, arbitrary, capricious, or discriminatory. *Id.* A regulation is arbitrary and unreasonable when it is not authorized by statute or is contrary or unsupported by the facts. *Baker v. Bd. of Adjustment*, 671 N.W.2d 405, 413 (Iowa 2003).

The city council's decision to rezone the *Field of Dreams* site was supported by the facts and was not arbitrary, capricious, or unreasonable. The city council made its decision after a full and lengthy consideration of the overall welfare of the city. The city council investigated water, sewage, traffic, crime, and water runoff. It received economic reports detailing increased jobs and revenue for the state and city. Each member of the city council attended meetings, read reports, asked questions, participated in public hearings, listened to the opinions of community members, and considered the economic benefits and impact on the city.

The petitioners also contend it was unreasonable for the mayor to enter into the MOU. We have generally analyzed challenges to these types of agreements to determine whether they are unreasonable, arbitrary, capricious, or discriminatory. *See, e.g., Blumenthal Inv. Trusts v. City of West Des Moines*, 636 N.W.2d 255, 266 (Iowa 2001). While the council members considered the MOU, they were not bound by it. *See, e.g., Marco Dev. Corp. v. City of Cedar Falls*, 473 N.W.2d 41, 44 (Iowa 1991). The MOU was simply an agreement whereby the council agreed to consider a rezoning proposal partially due to the incredibly unique circumstances surrounding the *Field of Dreams* land. Given the unique

parcel of land and the juxtaposition of agriculture and commercial land that already existed, it was not unreasonable, arbitrary or capricious for the city to agree to consider the possibility of rezoning the area.

3. *Relationship to the city's comprehensive plan.* Iowa Code section 414.3 requires that any zoning regulations adopted by a city council or board of supervisors "shall be made in accordance with a comprehensive plan." Iowa Code § 414.3. The party challenging a zoning decision on the basis that it was not made in accordance with the city's comprehensive plan carries a heavy burden that requires the party to counter the "strong presumption of validity accorded zoning decisions." 37 Am. Jur. Proof of Facts 3d 383 (1996 & Supp. 2016), Westlaw (database updated Dec. 2016). This requirement was adopted to prevent haphazard zoning. *Wolf v. City of Ely*, 493 N.W.2d 846, 849 (Iowa 1992). The purpose of the comprehensive plan requirement is to ensure a board or council acts rationally in applying its delegated zoning authority. *Id.* at 849.

In the context of rezoning, we have held that "compliance with the comprehensive plan requirement merely means that zoning authorities have given 'full consideration to the problem presented, including the needs of the public, changing conditions, and the similarity of other land in the same area.' " *Iowa Coal Min. Co. v. Monroe County*, 494 N.W.2d 664, 669 (Iowa 1993) (quoting *Montgomery*, 299 N.W.2d at 695). A board's zoning decision is not static, and the fact that a board or council may have failed to predict that an area of land could be rezoned for a different use is not enough to demonstrate that it acted without considering the comprehensive plan. *See, e.g., Montgomery*, 299 N.W.2d at 695.

The district court found that the rezoning was passed in accordance with and in furtherance of the comprehensive plan, despite none of the council members expressly linking their votes to the plan. We agree. The council members gave full consideration to "the needs of the public, changing conditions, and the similarity of other land in the same area." *Id.* The council held multiple meetings and the appropriate public hearing during which community members were able to offer differing viewpoints. All council members attended these meetings, listened, and asked questions. The city council requested and reviewed reports about water, sewage, water runoff, traffic, crime, and increased economic benefits. The council considered the unique nature of the *Field of Dreams* site and potential tourism benefits.

The city's comprehensive plan notes that rezoning should be made with consideration of the unique character of the area, the suitability of the land for the proposed use, the conservation of buildings or values, and the encouragement of the most appropriate use of the land. Comprehensive Plan at 91. All of these goals were considered by the council. The *Field of Dreams* site is a unique parcel of land unlike any other land in that area. The council considered the distinctiveness of the land and whether the proposed rezoning would be the best use of the site for the benefit of the community, including its impact on tourism. The council considered whether the proposed rezoning would be for the overall health and welfare of the community as a whole, and whether it would preserve the property for the benefit of its citizens. The city council concluded that it would be consistent with its comprehensive plan.

The city's community builder plan also specifically addresses the importance of preserving the *Field of Dreams* site in order to maintain

and increase tourism. The plan stated that a main concern for the city was to "become much more aggressive in guiding and encouraging [the city's] growth." Community Builder Plan at 2. It identified the loss of tourism to the *Field of Dreams* site as one of the main threats to the city's growth. *Id.* at 5. We hold that the petitioners did not meet their burden of demonstrating that the rezoning did not meet the requirements of the city's comprehensive plan.

4. *Spot zoning.* "Spot zoning is the creation of a small island of property with restrictions on its use different from those imposed on surrounding property." *Perkins*, 636 N.W.2d at 67. Not all spot zoning is illegal, however, and we have created a three-prong test for determining whether spot zoning is valid. *Id.* Under this test, we consider

> (1) whether the new zoning is germane to an object within the police power; (2) whether there is a reasonable basis for making a distinction between the spot zoned land and the surrounding property; and (3) whether the rezoning is consistent with the comprehensive plan.

*Id.*; *see also Little v. Winborn*, 518 N.W.2d 384, 388 (Iowa 1994). When there is spot zoning, "there must be substantial and reasonable grounds or basis for the discrimination when one lot or tract is singled out." *Perkins*, 636 N.W.2d at 67 (quoting *Fox v. Polk Cty. Bd. of Supervisors*, 569 N.W.2d 503, 509 (Iowa 1997), *overruled in part on other grounds by Sutton*, 729 N.W.2d at 799).

As a preliminary matter, we acknowledge that the rezoning appears to constitute spot zoning. The property surrounding the new commercial area is agricultural land. The rezoning created a commercial "island" of property amidst land zoned as agricultural. *See, e.g., Little*, 518 N.W.2d at 388. However, that does not end our inquiry. The next step is to determine whether the spot zoning was valid. *See id.*

First, we have already determined that the rezoning was made within the scope of the city council's general police power. The decision to rezone the area for the project was made in consideration of the general health and welfare of the community. Second, the council had a reasonable basis for its decision to rezone the land despite the surrounding property. The *Field of Dreams* property has been a unique site for years. The baseball field on the Lansing farm has been used in the community for baseball and softball games, in addition to local and national tourism. Part of the location's charm is simply that it is a baseball field surrounded by farmland. The council made the decision to rezone and allow for more baseball fields to capitalize on this unique site and increase tourism for the City of Dyersville. Last, as we already concluded, the spot zoning is consistent with the overall comprehensive plan. The city's community builder plan expressly mentions the necessity of maintaining the *Field of Dreams* site and increasing tourism for the city. We agree with the decision of the district court and hold that this was not illegal spot zoning.

**C. Triggering of Dyersville Code.** The petitioners allege that there was sufficient opposition to the proposed rezoning contained in Ordinance 770 to trigger a unanimous vote under Dyersville Code of Ordinances § 165.39(5). The code section provides,

> Council Vote. If the [Zoning and Planning] Commission recommends against, or if a protest against such proposed amendment, supplement, change, modification or repeal is presented in writing to the Clerk, duly signed by the owners of twenty percent (20%) or more either of the area of the lots included in such proposed change, or of those immediately adjacent in the rear thereof extending the depth of one lot or not to exceed two hundred (200) feet therefrom, or of those directly opposite thereto, extending the depth of one lot or not to exceed two hundred (200) feet from the street frontage of such opposite lots, such amendment, supplement,

change, modifications, or repeal shall not become effective except by the favorable vote of all members of the Council.

Dyersville, Iowa, Code of Ordinances § 165.39(5) (2011). Based on this code section, the petitioners contend that a unanimous vote of the council was required for the rezoning.

On the day of the hearing on the rezoning, the petitioners' attorney faxed a letter to the city clerk purporting to include the signatures of the required twenty percent of landowners needed to trigger the unanimous council vote. The opposition letter included the signatures of a number of individuals; however, only two of the signatories owned small amounts of property adjacent to the property to be rezoned. The petitioners did not provide a letter that included the requisite twenty percent of adjacent land owners at the time of the meeting, nor did they provide a letter or other document at trial. Accordingly, there was no formal or valid protest which would invoke the requirement of a unanimous vote.

**D.  Use of 200-Foot Buffer Zone.** The ordinance that rezoned the *Field of Dreams* property included a 200-foot buffer zone of agricultural land that surrounded the property that was rezoned to commercial. The petitioners challenge the use of this 200-foot buffer zone. They argue that the buffer zone was put in place in order to prevent the nearby property owners from objecting to the project under the procedure outlined in Iowa Code section 414.5. The council asserts that the purpose of the 200-foot buffer zone was to address some of the concerns raised about manure spreading, farming activities, and children playing baseball up against the property line of adjoining owners.

At first blush, the 200-foot buffer zone can appear to be unfair, as it limits the number of adjacent landowners who can object to the rezoning. However, it does provide a benefit to adjacent landowners by

addressing their expressed concerns with the rezoning. A number of petitioners raised concerns about hunting, spreading of manure, and grazing if their farming property was directly adjacent to the new ballfields. The buffer zone provides a solution to those concerns.

Additionally, a number of other courts have held that a council may avoid a supermajority vote requirement by creating a buffer zone between the property to be rezoned and the land of adjacent property owners. *See, e.g.*, *Schwarz v. City of Glendale*, 950 P.2d 167, 170 (Ariz. Ct. App. 1997) (noting that the use of buffer zones is the majority approach and upholding the use of a 150-foot buffer zone to avoid the triggering of a supermajority vote); *St. Bede's Episcopal Church v. City of Santa Fe*, 509 P.2d 876, 877 (N.M. 1973) (upholding a 100-foot buffer zone utilized to avoid the triggering of a supermajority vote); *Eadie v. Town Bd. of Town of N. Greenbush*, 854 N.E.2d 464, 467–68 (N.Y. 2006) (upholding a 100-foot buffer zone used to avoid triggering a supermajority vote); *Armstrong v. McInnis*, 142 S.E.2d 670, 679 (N.C. 1965) (upholding a buffer zone of 101 feet that avoided triggering a statutory supermajority vote). Some courts require a finding that the imposition of a buffer zone was for the town's general welfare and was not made for arbitrary or capricious reasons. *See, e.g.*, *Town of Beech Mountain v. Genesis Wildlife Sanctuary, Inc.*, 786 S.E.2d 335, 345 (N.C. Ct. App. 2016) (noting it was proper for the district court to allow factual evidence regarding the question of whether a 200-foot buffer zone was arbitrary or capricious).

Nevertheless, even if the petitioners had established the requirement of a supermajority vote under Iowa Code section 414.5, the requirement was met. The statute requires the pertinent ordinance to pass by a vote of three-fourths of all members of the council, or seventy-

five percent. Iowa Code § 414.5. The rezoning of the *Field of Dreams* site passed by a vote of 4–1, or eighty percent.

**E. Validity of Ordinance 777.** While the first appeal was pending, it was determined that Ordinance 770, and the corresponding notices regarding the rezoning, contained an incorrect legal description. In an attempt to correct the incorrect legal description, the city council passed Ordinance 777, which rezoned the subject property with the correct legal description. The petitioners allege Ordinance 777 is invalid because it rezoned property without the appropriate notice, public hearing, and due process requirements of *Gorman v. City Development Board*, 565 N.W.2d 607 (Iowa 1997).

In *Gorman*, the Roemig family requested the voluntary annexation of approximately 120 acres of their property into the City of Cedar Rapids. *Id.* at 608. The Roemigs erred in describing their property, which resulted in the description they provided to the city including forty acres of land owned by a neighbor and leaving out eighty acres owned by the Roemigs. *Id.* The city followed the proper notice protocols, but included the incorrect legal description. *Id.* The city council held a public meeting and unanimously adopted a resolution approving the annexation of the Roemig property. *Id.* The Linn County Board of Supervisors approved the annexation and, at the same time, corrected the error in the legal description. *Id.* A resident of Cedar Rapids, Gorman, sought judicial review. *Id.* We ultimately held that the Roemigs' application for voluntary annexation did not substantially comply with the statutory requirements because the applicable statute required a legal description of the property. *Id.* at 610.

We reached this conclusion for a number of reasons. First, the statute required the legal description of the property. *Id.* Second, the

statute required published notice, and we found that this implied a requirement that the property be legally described. *Id.* Last, the description was relied upon throughout the proceedings and therefore did not provide proper notice to the public or other potentially interested parties regarding which property was meant to be annexed. *Id.* at 611.

Failing to comply with every word of a statute is not fatal in every situation. *Id.*; *see also City of Des Moines v. City Dev. Bd.*, 473 N.W.2d 197, 200 (Iowa 1991). What we require is substantial compliance, which we have defined as "compliance in respect to essential matters necessary to assure the reasonable objectives of the statute." *Gorman*, 565 N.W.2d at 610 (quoting *Burnam v. Bd. of Review*, 501 N.W.2d 553, 554 (Iowa 1993)). We noted that, when we determine "whether the erroneous description satisfies the requirement of substantial compliance, we consider the impact of the error upon the proceedings." *Id.* at 610. The error in this case was significant because two-thirds of the property the Roemigs intended to annex into the city was not included in the legal description and forty acres were included that were never owned by the Roemigs. *Id.* at 611–12.

We have also decided other cases that included errors in the legal description of property. In *Incorporated Town of Windsor Heights v. Colby*, the legal description was listed as "Walnut Creek" when the proper description should have been "North Walnut Creek." 249 Iowa 802, 804–05 89 N.W.2d 157, 158 (1958). We held this was a "technical misdescription" and was not substantial. *Id.* at 806–07, 89 N.W.2d at 159. The error did not mislead any of the parties. *Id.* In *Wall v. County Board of Education*, a lengthy description of a parcel of real estate included one typographical error. 249 Iowa 209, 221–22 86 N.W.2d 231, 238–39 (1957). We held that the error did not mislead and did not

adversely affect the reorganization of school districts at issue. *Id.* Generally, substantial compliance requires that a statute or rule "has been followed sufficiently so as to carry out the intent for which it was adopted." *Bontrager Auto Serv., Inc. v. Iowa City Bd. of Adjustment*, 748 N.W.2d 483, 488 (Iowa 2008) (quoting *Brown v. John Deere Waterloo Tractor Works*, 423 N.W.2d 193, 194 (Iowa 1988)). Thus, we must determine whether the purpose of the statute or rule has been accomplished. *Id.*

In this case, neither the Iowa Code nor the Dyersville City Code of Ordinances require notice of the legal description of property. Iowa Code § 414.4 (requiring hearing and a notice of the time and place of the hearing but not requiring any particular description of the land); *id.* § 414.5 (noting that the same notice requirements apply equally to changes and amendments, and not requiring a legal description); *id.* § 414.6 (establishing a zoning commission responsible for recommending boundaries, but not requiring a legal description before a public hearing); Dyersville, Iowa, Code of Ordinances § 165.39(1) (requiring a clear description of the land, but not a legal description). Further, none of the members of the public were misled about the property the council voted to rezone. The intent of the notice statute requires a public hearing during which concerned citizens may be heard. Iowa Code § 414.4. The statute provides a procedure for providing published notice of a time and place of a public hearing, which was followed by the city council. *Id.* Many members of the community came to the public hearing and voiced their concerns about the rezoning of the *Field of Dreams* site. Many of the notices contained maps and drawings regarding the proposed property to be rezoned. There was no reasonable confusion regarding the property which was being considered for rezoning under ordinance 770.

Likewise, after the correction was included in ordinance 777, the city counsel provided notice to the public. No community members spoke at the city counsel meeting during which ordinance 777 was discussed and passed. We agree with the decision of the district court and find that the proceedings before the city council substantially complied with the statutory requirements. Ordinance 777 is valid.

**F. Equal Protection and Due Process.** The petitioners assert that the rezoning violated the equal protection and due process clauses of the Iowa Constitution. For purposes of the equal protection clause, they argue that all of the surrounding neighbors of the rezoned area are similarly situated, but the 200-foot buffer surrounding three sides of the area prevented those neighbors from exercising the same right to object as the neighbors whose property does not have a buffer. For purposes of procedural due process, they assert that they were not provided a meaningful opportunity to be heard.

The Iowa Constitution guarantees "[a]ll laws of a general nature shall have a uniform operation; the general assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms shall not equally belong to all citizens." Iowa Const. art. I, § 6. In practice, this means that "laws treat alike all people who are 'similarly situated with respect to the legitimate purposes of the law.'" *McQuistion v. City of Clinton*, 872 N.W.2d 817, 830 (Iowa 2015) (quoting *Varnum v. Brien*, 763 N.W.2d 862, 882 (Iowa 2009)). Zoning and land use ordinances that do not impact a suspect classification must only meet the rational relationship test. 16C C.J.S. *Building and Zoning Regulations* § 1590, 160–61 (2015); *see also Blumenthal*, 636 N.W.2d at 268.

We generally consider the federal and state equal protection clauses to be "identical in scope, import, and purpose." *War Eagle Vill. Apartments v. Plummer*, 775 N.W.2d 714, 719 (Iowa 2009) (quoting *State v. Bower*, 725 N.W.2d 435, 441 (Iowa 2006)). The Supreme Court has succinctly articulated the rational basis test under the Federal Constitution as a "question [of] whether the classifications drawn in a statute are reasonable in light of its purpose." *Bierkamp v. Rogers*, 293 N.W.2d 577, 580 (Iowa 1980) (quoting *McLaughlin v. Florida*, 379 U.S. 184, 191, 85 S. Ct. 283, 288, 13 L. Ed. 2d 222, 228 (1964)). We use this test as a guiding principle in our analysis of the rational basis test under the Iowa Constitution. *Racing Ass'n of Cent. Iowa v. Fitzgerald (RACI)*, 675 N.W.2d 1, 7 (Iowa 2004) ("It was this enunciation of the rational basis test that our court said in *Bierkamp* was appropriate for analyzing a claim based on the Iowa equality provision found in article I, section 6 of the Iowa Constitution."); *Bierkamp*, 293 N.W.2d at 580 ("We have long found a standard similar to that of *McLaughlin* to flow from Article I, section 6.").

Based on the principles of the federal test, we have developed a three-part framework to assist our analysis when we evaluate whether the rational-basis test has been met under the Iowa Constitution. *See, e.g., McQuistion*, 872 N.W.2d at 831; *Horsfield Materials, Inc. v. City of Dyersville*, 834 N.W.2d 444, 458–59 (Iowa 2013); *RACI*, 675 N.W.2d at 7–8. First, we must determine whether there was a valid, "realistically conceivable" purpose that served a legitimate government interest. *McQuistion*, 872 N.W.2d at 831 (quoting *RACI*, 675 N.W.2d at 7); *see also Horsfield*, 834 N.W.2d at 458. To be realistically conceivable, the ordinance cannot be "so overinclusive and underinclusive as to be irrational." *Horsfield*, 834 N.W.2d at 459 (quoting *State v. Mitchell*, 757

N.W.2d 431, 439 (Iowa 2008)). Next, we decide whether the identified reason has any basis in fact. *McQuistion*, 872 N.W.2d at 831. Last, we evaluate whether the relationship between the classification and the purpose for the classification "is so weak that the classification must be viewed as arbitrary." *Id.* (quoting *RACI*, 675 N.W.2d at 8).

We also recognize that the rational-basis test is a deferential test. *Horsfield*, 834 N.W.2d at 458; *Ames Rental Prop. Ass'n v. City of Ames*, 736 N.W.2d 255, 259 (Iowa 2007). Under the rational-basis test, we presume that the ordinance is constitutional unless the challenging party is able to meet its burden to "negat[e] every reasonable basis that might support the disparate treatment." *Horsfield*, 834 N.W.2d at 458 (quoting *Ames Rental Prop. Ass'n*, 736 N.W.2d at 259). We will not declare something unconstitutional under the rational-basis test unless it "clearly, palpably, and without doubt infringe[s] upon the constitution." *RACI*, 675 N.W.2d at 8 (quoting *Glowacki v. State Bd. of Med. Exam'rs*, 501 N.W.2d 539, 541 (Iowa 1993)).

The rezoning decision here clearly meets the rational-basis test. The council made the decision to rezone the *Field of Dreams* site in consideration of the best interests of Dyersville. It considered the economic impact of increased tourism and investigated any water, sewage, traffic, and crime issues the rezoning could create. The decision was made with the overall zoning scheme of the city in mind, as one of the main goals of the comprehensive plan is to expand tourism to Dyersville via the *Field of Dreams* site. There was a "realistically conceivable" purpose for the rezoning that served a legitimate government interest, because the council believed the rezoning could increase tourism to the city. *See, e.g., McQuistion*, 872 N.W.2d at 831. The council's determination that the ballpark could increase tourism to

the city and could lead to more jobs and to the tax base of the city was based on facts presented to and considered by the council. *See, e.g., id.* The council ordered studies done regarding the financial impact on the city and listened to the opinions of multiple community members. Additionally, the use of the 200-foot buffer zone was a reasonable solution to the concerns of the community members and was not arbitrary or capricious. Last, as we determined above, the reason for the rezoning was not arbitrary. *See, e.g., id.* There was no equal protection violation in this case.

The due process clause commands that "no person shall be deprived of life, liberty, or property, without due process of law." Iowa Const. art. I, § 9. "The requirements of procedural due process are simple and well established: (1) notice; and (2) a meaningful opportunity to be heard." *Blumenthal,* 636 N.W.2d at 264; *see also Aluminum Co. of Am. v. Musal,* 622 N.W.2d 476, 479 (Iowa 2001) ("The two fundamental principles of due process are (1) notice and (2) the opportunity to defend.").

We have held that procedural due process does not require a formal evidentiary hearing before the city council in the context of rezoning. *Montgomery,* 299 N.W.2d at 693. "Even if we assume that neighbors to a rezoned area have a life, liberty or property interest which requires some type of hearing, the statutorily required comment-argument hearing . . . is sufficient to meet due process." *Id.* The petitioners were given adequate notice of the parcel of land that was proposed to be rezoned and adequate notice of the time and place of city council meetings and hearings. Further, they were actually heard on numerous occasions, as a number of the petitioners attended both regular city council meetings and the public hearing on the issue of

rezoning. All community members in attendance who wished to speak were allowed. The petitioners in this case were afforded procedural due process.

### III. Conclusion.

We conclude that the district court was correct in annulling the writs of certiorari. The city council acted in its proper legislative function when it rezoned the *Field of Dreams* property. Both ordinances were validly passed, and no procedural or substantive errors affected the decisions of the city council in its rezoning decisions.

**DECISION OF DISTRICT COURT AFFIRMED; WRITS ANNULLED.**

All justices concur except Wiggins, J., who concurs specially.

#15–1413, *Residential & Ag. Advisory Comm. v. Dyersville City Council*

**WIGGINS, Justice (concurring specially).**

I concur with the majority decision.  Our decision does not mean that the actions of the city council are not beyond the reach of the persons they were elected to serve.  At the next election, the council's actions are subject to review by the electorate.  Under the separation-of-powers doctrine, "electoral control [is] an important restraint on legislative conduct."  *Teague v. Mosley*, 552 N.W.2d 646, 650 (Iowa 1996).